**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **FIRST FINANCIAL BANK,** | ) | |
| | ) | <u>**PUBLISH**</u> |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 08-0731-WS-M** |
| | ) | |
| **CS ASSETS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter comes before the Court on the Motion for Summary Judgment of Defendant (doc. 46) and on the Motion for Summary Judgment by Plaintiff (doc. 51).  Both motions have been extensively briefed and are now ripe for disposition.

**I.      Nature of the Case.**

This dispute involves two lenders who do not see eye to eye as to the redemption of real property under Alabama law.[1]  Plaintiff, First Financial Bank ("First Financial"), and defendant, CS Assets, LLC ("CS Assets"), were both mortgagees for the same five parcels of property located on Little Lagoon in Gulf Shores, Alabama.  When the mortgagor (which is not a party hereto) defaulted on its loan obligations, CS Assets (the senior mortgagee) foreclosed on those five parcels, as well as two others.  Thereafter, First Financial (a junior mortgagee) invoked the statutory redemption mechanism prescribed by Alabama Code §§ 6-5-247, *et seq*.  There is no doubt that First Financial has the right to redeem those five parcels in which it possesses an interest.  Nonetheless, the parties emphatically disagree as to the proper redemption price.  Having proven unwilling or unable to find common ground on virtually any component of the redemption price calculations, the parties now call upon the Court to blaze a trail across a

---

[1]      This action was originally filed in the Circuit Court of Baldwin County, Alabama; however, defendant properly removed it to federal court on December 22, 2008.  Subject matter jurisdiction rests on 28 U.S.C. § 1332, inasmuch as the parties are of diverse citizenship and the amount in controversy greatly exceeds the jurisdictional threshold of $75,000.

foreboding landscape of esoteric legal principles, hoary Alabama precedents, and heretofore-unexplored statutory language to fix the redemption price, all against the backdrop of a complex, multifaceted commercial transaction.  Their cross-motions for summary judgment (with criss-crossing and overlapping legal issues, and arguments that seamlessly bounce back and forth from the briefing on one motion to that on the other, such that their briefs read like a series of six briefs on a single motion rather than three briefs on each of two distinct motions) have presented these issues for resolution at this time.

## II.    Background.

### A.    *Factual History.*[2]

The facts concerning the underlying loan transactions and foreclosure are critical to certain of the issues presented on summary judgment.  Those facts are somewhat complicated, but largely uncontested.

Our story begins innocuously enough in November 2004, when a non-party developer called West Beach, LLC ("West Beach"), sought to build a 90-unit condominium project fronting on Little Lagoon in Gulf Shores, Alabama, with beach access to the Gulf of Mexico. That month, West Beach borrowed $2,000,000 from non-party Heritage Bank ("Heritage"), and granted Heritage a mortgage on six parcels of property (labeled Parcels A, B, C, D, E and F). (Province Dep., at Exhs. 5 & 6.)[3]  Five months later, in April 2005, West Beach borrowed $1,000,000 from First Financial and, as security, granted First Financial a mortgage on Parcels A, B, C, D and E (but, significantly, not Parcel F).  (*Id.* at Exh. 7.)

---

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, with respect to each motion for summary judgment, the nonmovant's evidence is taken as true and all justifiable inferences are drawn in its favor.

[3]    Parcels A through E were on the north side of West Beach Boulevard, fronting on Little Lagoon, and were intended to provide the "pad" for the condominium project, while Parcel F was on the south side of West Beach Boulevard, fronting on the Gulf of Mexico, and was intended to provide condo owners with private access to the beach and the Gulf.  The record shows that Parcel F is an 0.5 acre lot found at 1601 West Beach Blvd., Gulf Shores, Alabama. (Hollon Aff., ¶ 3.)

Unfortunately, West Beach's business fortunes deteriorated, such that by early 2007 it was in default of its obligations under both the Heritage loan and the First Financial loan. (Freeman Aff., ¶¶ 2, 3; doc. 48, Exh. D.)  First Financial directed its counsel to foreclose on the mortgage on May 31, 2007 unless satisfactory arrangements were reached in the interim. (Freeman Aff, ¶ 4.)  Meanwhile, Heritage's successor in interest sold the Heritage loan to CS Assets on April 12, 2007, and assigned the associated promissory note and mortgage to CS Assets on April 19, 2007.  (Doc. 48, Exhs. E - G.)  The Loan Purchase and Sale Agreement reflects that as of April 16, 2007, the amounts owed by West Beach under the Heritage loan consisted of the following: "$2,000,000 principal, $105,875 accrued interest, $4,500 appraisal fee, and approximately $20,000 attorneys fees."  (Doc. 48, Exh. E, at ¶ 6.D.)

In lieu of foreclosing on the Heritage mortgage based on West Beach's default, CS Assets extended and modified the loan.  On April 30, 2007, West Beach and CS Assets entered into a Renewal Promissory Note and an Amendment to Mortgage and Security Agreement. (Doc. 48, Exhs. H, I.)  The Renewal Promissory Note provided that West Beach owed the principal sum of $2,515,722, with interest accruing at the rate of 12% per annum until paid in full.  (Doc. 48, Exh. H.)  A separate Loan Agreement executed by CS Assets and West Beach on April 30, 2007, explained how the new principal amount had been calculated, as compared to the original Heritage loan, which had a principal sum of $2,000,000.  In particular, the Loan Agreement reflects the following: (1) as of April 30, 2007, West Beach's indebtedness under the Heritage loan was in the "total amount of $2,300,000.00, which amount includes late charges, fees, expenses and a default rate of interest" (Mosher Dep., Exh. 18, at 1); and (2) the remaining principal consisted of an interest reserve of $150,943, a "renewal fee" of $75,472, lender's fees and expenses of $27,488, and taxes and recording costs of $11,819, less $50,000 in cash to be paid at closing (*id.* at 2).[4]  In the Amendment to Mortgage and Security Agreement executed in

---

[4]     Although the Loan Agreement and Renewal Promissory Note are both dated April 30, 2007, there is a small discrepancy between the principal amounts identified in those documents.  The Loan Agreement provides that "the principal amount of the Renewal Note shall be $2,460,777.00."  (Mosher Dep., Exh. 18 at 2.)  But the itemized computations in the Loan Agreement provide for a total principal amount of $2,510,989.00.  (*Id.*)  And of course the Renewal Promissory Note itself recited a principal balance of $2,515,722.  (Doc. 48, Exh. H.) The parties have neither raised nor explained these discrepancies, and the Court will not

connection with the loan modification, West Beach granted CS Assets a mortgage on a seventh parcel of land, which has been dubbed in these proceedings the "Metes and Bounds Parcel." That parcel is also located north of West Beach Boulevard and is adjacent to some or all of Parcels A through E.  (Doc. 48, Exh. I.)

While all of this was taking place with the Heritage mortgage, First Financial was not standing idly by.  Rather, First Financial and West Beach negotiated an Accommodation Agreement in Lieu of Foreclosure, which was finalized on May 30, 2007.  (Doc. 48, Exh. J.) This Agreement extended the maturity date of the First Financial loan through September 30, 2007, and required West Beach to pay interest, fees, late charges, and an interest reserve in a total amount exceeding $145,000.  In that Agreement, West Beach and First Financial agreed that the modification executed between CS Assets and West Beach for the Heritage loan "is subordinate to the mortgage of First Financial ... for any amount in excess of $2,308,119.00, it being understood that additional amounts may accrue pursuant to the original $2,000,000.00 loan."  (*Id.*, ¶ 3.a.)  Of course, CS Assets was not a signatory to the Accommodation Agreement between West Beach and First Financial, and no formal agreement was executed by First Financial and CS Assets to pin down the relative priority of the various items rolled into the original Heritage loan by virtue of the CS Assets / West Beach loan modification.[5]

---

investigate them *sua sponte*.

[5]      In fact, the parties disagree as to whether they ever had an agreement on the priority issue.  Review of the correspondence between CS Assets and First Financial, however, confirms that a meeting of the minds was established, notwithstanding the lack of a separate written contract.  To be sure, the parties' email exchanges in late May 2007 initially reflect profound divergence in views as to priority, with First Financial taking the position that the CS Assets modification of West Beach's indebtedness from $2,000,000 to $2,515,722 would be subordinate to First Financial's interest for any amount over  $2,000,000, and CS Assets responding that the accumulated interest, late charges and fees on the original Heritage loan were such that the CS Assets loan had priority over the First Financial loan up to the amount of approximately $2,300,000.  (Mosher Dep., Exhs. 11 & 12.)  However, a series of emails dated May 31, 2007 demonstrates that the parties had forged an agreement.  In particular, First Financial "acknowledge[d] that the original $2,000,000.00 has been increased by interest, late charges and attorney's fees due on the original $2,000,000.00, and that the original $2,000,000.00 will continue to accrue interest, possibly late charges and attorney's fees, all of which would have priority and be secured."  (*Id.*, Exh. 13.)  A short time later, CS Assets replied

Unfortunately for all concerned, West Beach proved unable to satisfy even these reworked financial obligations, and ultimately defaulted on both loans.  Pursuant to its position as senior lender, CS Assets foreclosed on all seven West Beach parcels (including Parcels A through E, as to which First Financial held a second mortgage, and Parcel F and the Metes and Bounds Parcel, as to which First Financial held no interest) on November 30, 2007.  (Doc. 49, Exh. M, at ¶ 8.)  At auction, the highest and best bid for those seven parcels was CS Assets' credit bid of $1,600,000.  (Doc. 48, Exh. K.)[6]  That $1.6 million bid was offset from West Beach's total indebtedness to CS Assets, which CS Assets computed at that time as being $2,682,977.20 (including interest and late charges).  (Mosher Dep., Exh. 5, at ¶ 13.)  Subtracting the foreclosure bid from the balance owed yielded a resulting deficiency of $1,082,977.20, as of November 30, 2007, plus reasonable attorney's fees.  (*Id.* at ¶¶ 13-14.)

Sometime later, First Financial timely elected to exercise its statutory right of redemption under Alabama law.  Although there were, by all accounts, extensive negotiations between the parties that nearly produced a mutually acceptable redemption price, they were ultimately unsuccessful.  When the negotiations failed, all potential points of agreement of compromise fell by the wayside, and this litigation followed.

### B.     *Relevant Procedural History.*

On or about November 7, 2008, First Financial filed its Complaint for Redemption of

---

in concurrence, observing that (1) "the first mortgage cannot exceed the principal, plus all other amounts properly chargeable under the original note as renewed and extended," (2) "First Financial agrees that this amount is the $2,308,119," (3) "[i]nterest will continue to accrue" on that amount, and (4) "[t]he additional charges contained in the renewal note that do not arise under the note would be subordinate to the First Financial mortgage."  (*Id.*, Exh. 14.)  First Financial did not write back to refute any of these points.  Given the clarity of the parties' written communications as to priority, and the lack of any contemporaneous materials to the contrary, there are no genuine issues of material fact as to whether First Financial and CS Assets reached agreement as to the priority issues, nor are there fact questions as to the terms of that agreement.

[6]     The record establishes that CS Assets obtained the seven West Beach parcels at a substantial discount from their then-market value.  In setting its bid, CS Assets worked from the assumption that those parcels were valued *in toto* at $2.4 million as of March 1, 2007.  (Mosher Dep., Exh. 5, at ¶ 12.)  As we shall see, however, appraisals as of the date of foreclosure fixed the value of the seven parcels much higher.

Real Property against CS Assets in state court.[7]  The Complaint specified that First Financial was seeking to exercise its statutory right of redemption pursuant to Alabama Code §§ 6-5-247 *et seq.*, as to all seven West Beach parcels (*i.e.*, Parcels A through F, and the Metes and Bounds Parcel).  Following removal to federal court, CS Assets filed a Partial Motion to Dismiss (doc. 5), challenging First Financial's ability to redeem Parcel F and the Metes and Bounds Parcel, as to neither of which First Financial professed to be a mortgagee or to hold any legal or equitable interest.  This Court granted the Partial Motion to Dismiss, and dismissed First Financial's redemption claims as to Parcel F and the Metes and Bounds Parcel, pursuant to the following reasoning:

> "Given the common-sense notion under Alabama law that ... one cannot redeem property in which one has no interest, and given that the purposes of the redemption device would be in no way served by allowing redemption in that scenario, First Financial has not stated a claim on which relief can be granted insofar as it seeks redemption of those two parcels.  Accordingly, the Motion to Dismiss (doc. 5) is **granted**, and plaintiff's claims for redemption of Parcel F and the Metes and Bounds Parcel are **dismissed**; provided, however, that by virtue of having pursued this Motion, CS Assets has waived any right it may have had to object to this action as an improper piecemeal redemption.  In so ruling, the Court expressly invokes its equitable powers to adjust the rights and equities of the parties, as conferred by Alabama Code § 6-5-256."

*First Financial Bank v. CS Assets, LLC*, 2009 WL 959562, *5 (S.D. Ala. Apr. 7, 2009).

As a result of this ruling, First Financial's claims for redemption of Parcel F and the Metes and Bounds Parcel were extinguished.  CS Assets has never challenged First Financial's right to redeem the other five West Beach parcels.  Accordingly, the <u>only</u> remaining question animating this litigation is the proper redemption price for Parcels A through E.  Both parties have requested that this Court resolve the issue on summary judgment, with First Financial touting a redemption price of $1,612,695, and CS Assets championing a competing figure of $3,272,156.40, more than double that proposed by First Financial.  The points of disagreement between the parties embrace almost every conceivable component of the redemption price

---

[7]        In connection with this filing, First Financial tendered the full disputed redemption price by paying those funds into the registry of the Baldwin County Circuit Court. Subsequent to removal, those funds were transferred to the registry of this District Court, where the balance is $3,207,995.65, plus interest accrued since the February 27, 2009 deposit date.

calculation, with First Financial consistently taking the position that will minimize its financial obligations to CS Assets, and CS Assets adopting the opposite stance.  Nor surprisingly, law and equity would put the redemption price somewhere between these extremes.

       *C.*     *The Deficiency Litigation.*

      This internecine quarrel between First Financial and CS Assets has not taken place in a vacuum.  Contemporaneously with this lawsuit, CS Assets pursued a deficiency action against West Beach in the U.S. District Court for the Northern District of Alabama, styled *CS Assets, LLC v. West Beach, LLC, et al.*, CV-07-PT-2254-S (the "*West Beach* Action").  In that lawsuit, CS Assets sought a judgment for West Beach's outstanding indebtedness on the Renewal Promissory Note executed in April 2007, while West Beach counterclaimed in an attempt to void the foreclosure sale.  (Doc. 49, Exh. M, at ¶ 9.)[8]  On August 12, 2009, Senior District Judge Propst entered a Final Judgment in the *West Beach* Action granting CS Assets' motion for summary judgment, and awarding CS Assets the sum of $1,311,080.60.  (Doc. 48, Exh. L.)  The Final Judgment explained that the judgment in CS Assets' favor included reasonable attorney's fees and expenses in the amount of $50,000,[9] a late charge penalty of $60,000 (as to which no interest would be calculated), and $243,889.40 in interest.[10]  (*Id.*)

      The record reflects that West Beach filed a Notice of Appeal from this Final Judgment on September 24, 2009.  (Doc. 53, Exh. F.)  The appeal of the *West Beach* Action remains pending

---

[8]      Pleadings filed in the *West Beach* Action show that West Beach sought to invalidate the foreclosure sale on a variety of grounds, including without limitation the following: (1) CS Assets' conduct amounted to wrongful foreclosure; (2) the $1.6 million foreclosure price was so low as to shock the conscience, given that the property had been appraised as high as $8.4 million; and (3) CS Assets breached its fiduciary duties to West Beach by neither acting in good faith nor adopting all reasonable modes of proceeding in order to render the sale most beneficial to West Beach.  (Doc. 53, Exh. G.)  The crux of West Beach's counterclaim was that it sought to have the November 2007 foreclosure sale set aside, and to bring about a re-sale of the property.

[9]      Even as it recognizes that only $50,000 in reasonable attorney's fees and expenses were awarded in the *West Beach* Action, CS Assets presents evidence in this case that it actually incurred $78,824.33 in attorney's fees and expenses.  (Doc. 49, Exh. M, at ¶¶ 10-11.)

[10]      The interest line item was computed at $393.37 per day, on the underlying debt of $957,191.20, from November 30, 2007 through August 12, 2009.  (*Id.*)

before the Eleventh Circuit Court of Appeals at this time.

## III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

"The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment."  *Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (citations omitted); *see also Godard v. Alabama Pilot, Inc.*, 485 F. Supp.2d 1284, 1291 (S.D. Ala. 2007) (same).  Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits").  Nonetheless, "cross-motions may be probative of the absence of a factual dispute

-8-

where they reflect general agreement by the parties as to the dispositive legal theories and material facts."  *Murray*, 620 F. Supp.2d at 1307 (citations omitted); *see also Godard*, 485 F. Supp.2d at 1291.

**IV.    Analysis.**

  *A.    Structure of Alabama's Redemption Statute.*

   At its core, "[r]edemption involves a buying back of the property."  *Morgan Plan Co. v. Bruce*, 97 So.2d 805, 808 (Ala. 1957).  "After real property is sold at a foreclosure sale to pay the encumbrances on it, various parties may redeem that property from the purchaser by paying the appropriate redemption price."  *Southeast Enterprises, Inc. v. Byrd*, 720 So.2d 873, 874 (Ala. 1998).  There is a fundamental disagreement between First Financial and CS Assets as to the "appropriate redemption price" in this case.

   In Alabama, the right of redemption is purely a creature of statute.  *See, e.g., Federal Home Loan Mortg. Corp. v. Bates*, 644 So.2d 925, 927 (Ala. 1994) ("The right to redeem property after foreclosure is conferred exclusively by statute.").[11]  As a result, the parties' quarrels concerning the redemption price must be settled by application of the redemption of real estate provisions found at Title 6, Article 14A of the Code of Alabama.  The issues joined on summary judgment are expressly governed by Alabama Code §§ 6-5-247 *et seq.*, which was enacted in 1988.  Therefore, the most logical starting place for the analysis lies in a review of the statute itself.

   The Eleventh Circuit has summarized Alabama's redemption statute as follows: "Alabama law recognizes a statutory right of redemption, which entitles certain persons ... to obtain title to foreclosed property within one year of the foreclosure sale by tendering the price paid at the sale plus interest and other lawful charges."  *In re Poe*, 477 F.3d 1317, 1319 (11th Cir. 2007).  There is no dispute that Parcels A through E are subject to redemption under this statute,

---

   [11]    *See also Costa and Head (Birmingham One), Ltd. v. National Bank of Commerce of Birmingham*, 569 So.2d 360, 362 (Ala. 1990) ("The right to redeem after a mortgage foreclosure is a statutory right."); *Bank Independent v. Jenkins Builders, Inc.*, 564 So.2d 880, 881 (Ala. 1990) ("The right of redemption is statutory, and it must be exercised in the mode, manner, and time provided by statute."); *In re McKinney*, 174 B.R. 330, 334 (Bankr. S.D. Ala. 1994) (post-foreclosure, "under Alabama law, the only way to redeem the property is through a cash payment ... under the right of statutory redemption").

that First Financial falls within the class of persons entitled to exercise the right of redemption, and that First Financial timely invoked its right of redemption.  Rather, the only point of contention between the parties is what the proper redemption price for Parcels A through E should be.

On the subject of redemption price, the Alabama statute delineates specific categories of lawful charges that the redemptioner must pay.[12]  The relevant categories for purposes of this case consist of "the purchase price paid at the sale, with interest at the rate allowed to be charged on money judgments as set forth in Section 8-8-10 (as it is now or hereinafter may be amended)" and "any balance due on the debt, with interest as aforesaid thereon to date."  Ala. Code § 6-5-253(a).[13]  As we shall see, this deceptively straightforward language conceals a tangled snarl of complexities that the parties have brought to the fore in their summary judgment motions.

Two other features of the Alabama statute bear mentioning.  First, the law makes clear that "[t]he statutory rights of redemption given or conferred by this article are mere personal privileges and not property or property rights."  Ala. Code § 6-5-250.  Second, the statute undeniably has an equitable component.  Where, as here, the party seeking redemption has paid into court the full amount of purchase money, lawful charges and interest necessary for redemption, the court "shall take jurisdiction thereof and ***settle and adjust all the rights and***

---

[12]    In conformity with conventions utilized in the relevant case law, First Financial will be referred to herein as the "redemptioner" or the "redeeming party," and CS Assets will be referred to as the "purchaser" in foreclosure from which redemption is being made.

[13]    The statute also provides for several other forms of lawful charges, such as permanent improvements; taxes paid or assessed; insurance premiums paid or owed by the purchaser; all recorded judgments, recorded mortgages and recorded liens having a higher priority in existence at the time of sale which are revived by operation of the statute; and mortgages given by the purchaser on the land to the extent of the purchase price.  Ala. Code § 6-5-253(a)(1)-(5).  In summary judgment briefing, CS Assets has expressly disclaimed any intent to seek inclusion of charges for permanent improvements, insurance premiums, taxes paid or assessed, interest on these three items, or other valid liens or encumbrances owned by the purchaser.  (Doc. 48, at 13 n.27.)  And no higher priority judgments, mortgages or liens (other than the balance due on the CS Assets loan, which has already been covered by the "balance due on the debt" category of charges) have been identified.  Therefore, none of those categories of lawful charges prescribed by the Alabama redemption statute need be considered here.

*equities of the parties*, as provided in this article." § 6-5-256 (emphasis added).[14]

      **B.**      **Inclusion of the Purchase Price Paid at the Sale.**

      As mentioned *supra*, one element of the redemption price is "the purchase price paid at the sale," meaning the underlying foreclosure. Ala. Code § 6-5-253(a). Everyone agrees that CS Assets paid $1.6 million at the foreclosure sale *in globo* for Parcels A through F, plus the Metes and Bounds Parcel. In a straightforward application of § 6-5-253(a), CS Assets would include that $1.6 million in the redemption price.

      By contrast, First Financial proposes a different calculation framework, excluding the entire purchase price at foreclosure from the redemption price and substituting in its place the amount of CS Assets debt secured by the mortgage. (Doc. 52, at 15.) In support of this methodology, First Financial points to the Alabama Supreme Court's statement more than a quarter century ago that "when the mortgagee buys at foreclosure sale, the amount of the debt

---

      [14]      Clearly, then, the statute requires courts in redemption actions to take into account the equities. In recognition of this fact, both parties appeal to the undersigned's sense of fairness in briefing their respective positions. The Court will certainly consider the equities. In doing so, however, a pair of observations comes to mind. First, given the marked difference between the dueling redemption prices proposed by the parties and reasonable estimates of market value of the parcels in question, as well as the divergence between the foreclosure price and each of the aforementioned figures, it is apparent that both sides will come out ahead, whatever the ultimate resolution of this case may be. (*See* doc. 56, at 7-8; doc. 60, at 12.) The "equities" involved here are not the kind that leave one party penniless and bereft, and other luxuriating in opulence. Both parties stand to profit here, with the only question being by how much. This conclusion leads directly to the Court's second observation, which is that we are here solely because of both sides' inability to work together to divide the pie in a mutually satisfactory manner. There is a reason why the parties have been relegated to citing ancient Alabama precedents under predecessor statutory schemes, and there is a reason why many aspects of their dispute have not been confronted or decided in modern Alabama jurisprudence. The reason is that parties in redemption disputes typically realize it is in their mutual best interest to reach a satisfactory compromise on redemption pricing issues. First Financial and CS Assets could have reached such an outcome here. In fact, record evidence confirms that "[p]rior to suit being filed we got very close to an agreement but did not ever get an agreed upon price." (Mosher Dep., at 82.) Rather than making further compromises to advance the negotiations from "very close" to "yes," the parties elected to go to war, consuming considerable litigant and judicial resources as they fight tooth and nail about every calculation and parameter of the redemption price, knowing full well that Alabama law is unsettled (and, indeed, opaque) in many of these respects. It is with that history in mind that the Court performs its statutory function of adjusting "all the rights and equities of the parties" pursuant to Alabama's redemption statute.

-11-

secured by the mortgage is treated as the purchase price rather than the amount bid." *Garvich v. Associates Financial Services Co. of Alabama, Inc.*, 435 So.2d 30, 34 (Ala. 1983). However, *Garvich* was not setting forth a prophylactic rule applicable in all redemption cases; rather, the cases on which it relies state the principle as follows: "when the mortgagee ... buys at the foreclosure sale, the 'purchase money' is the amount due on the mortgage debt (*if less than that bid at the sale*) and not the sum which was bid." *Durr Drug Co. v. Acree*, 2 So.2d 903, 905 (Ala. 1941) (citations omitted and emphasis added).[15] That is simply not the case here, as CS Assets bid $1.6 million on the property while the underlying mortgage debt was (by all accounts) in excess of $2 million. Moreover, First Financial's suggestion that the bid price should be ignored in favor of the mortgage debt amount proceeds in disregard of Alabama's current redemption statute, which governs this matter and unquestionably recites as <u>separate</u> lawful charges "the purchase price paid at the sale" and "any balance due on the debt." Ala. Code § 6-5-253(a).[16] For both of these reasons, the Court declines First Financial's invitation to collapse the foreclosure price and the mortgage debt owed into a single line item for purposes of computing the redemption price.[17]

_____

[15]     This was indeed the situation in *Garvich*, where the net balance due on the mortgage was $38,686.82, but the bid price at foreclosure was $45,252.45. *Garvich*, 435 So.2d at 31-32. The *Garvich* opinion specifically noted "the nearly $10,000.00 difference between the amount secured by the mortgage and the subsequent purchase price." *Id.* at 34.

[16]     To underscore the point that the purchase price is a mandatory component of the redemption amount, the statute is all-inclusive in its wording, as it reads that "[a]nyone entitled and desiring to redeem real estate ... must also pay or tender to the purchaser ... the purchase price paid at the sale." *Id.* This language admits of no ambiguity. The purchase price paid in foreclosure is a cornerstone of the redemption price, and must be paid by "anyone" seeking to exercise the redemption privilege.

[17]     First Financial's sole argument about the purchase price is that it should not be included at all because it is supplanted by the amount of the mortgage debt for redemption purposes where (as here) the mortgagee bought in foreclosure. In light of First Financial's failure to put forward alternative arguments such as, for example, possible contentions that the purchase price might be reduced or offset for some reason in the redemption price calculations, the Court will not take it upon itself to articulate those arguments on plaintiff's behalf. The parties have briefed this case extensively on cross-motions for summary judgment, and have been granted unfettered opportunities to raise whatever arguments they wish. Accordingly, the Court confines itself to the specific issues and arguments presented in the parties' respective

In light of the foregoing, the Court finds that the redemption price owed to CS Assets includes the underlying foreclosure price of **$1,600,000**. That figure will be added to the other lawful charges in calculating the total redemption price.

> ### C.      *Calculation of Interest on the Purchase Price.*

The Alabama redemption statute requires that the redemption price include interest on the purchase price paid at the foreclosure sale. Such interest must be calculated "at the rate allowed to be charged on money judgments as set forth in Section 8-8-10 (as it is now or hereinafter may be amended)." Ala. Code § 6-5-253(a). The cross-referenced section provides that judgments for the payment of money in a contract action "bear interest from the day of the cause of action, at the same rate of interest as stated in said contract," and that judgments in all other cases "shall bear interest at the rate of 12 percent per annum." Ala. Code § 8-8-10. In the redemption context, the Alabama Supreme Court has explained that "[t]his language provides for application of the contract rate or, if there is no contract rate, a fixed rate. When used to compute a redemption price, § 8-8-10 ... prevents windfalls by providing mortgagees only the amount of interest they contracted for with the mortgagor, not a higher fixed rate." *Southeast Enterprises*, 720 So.2d at 877.

CS Assets seeks interest at the statutory default rate of 12% on the entire $1.6 million purchase price from the date of foreclosure (November 30, 2007) through the present. For its part, First Financial does not challenge applicability of the 12% interest rate, but it does object to CS Assets' proposed time frame. According to First Financial, interest should run only through the date the Complaint in redemption was filed (November 7, 2008), rather than the date of judgment in this action. Unfortunately, § 6-5-253(a) is ambiguous on this point, inasmuch as it does not expressly delineate the date or event terminating accrual of interest.

Under the current redemption statute, there is substantial Alabama appellate authority for the proposition that, when a redeeming party has tendered funds and otherwise complied with the statutory requirements, and when a dispute erupts as to the proper redemption price, interest

---

summary judgment briefs, and expressly declines to resculpt the terrain *sua sponte* to frame the case in terms of issues that might have been raised but were not, or to make adjustments to categories of lawful charges that the parties never requested in their Rule 56 submissions.

does not continue to accrue through final adjudication of that dispute.  As one Alabama appellate court put it, "[t]he date of redemption is important for the computation of interest. ... Ordinarily, if the statutory requirements are met, the date of redemption is deemed to be the day the complaint to redeem was filed" where "the redeeming party has paid or tendered the amounts due."  *Pankey v. Daugette*, 671 So.2d 684, 689 (Ala.Civ.App. 1995).  Similarly, in *Watts v. Rudulph Real Estate, Inc.*, 740 So.2d 1085, 1088 (Ala.Civ.App. 1998), the court found that the purchaser was entitled to interest only through the date of the purchaser's refusal of the redemptioner's valid attempt at redemption.  In so holding, the *Watts* court explained that "[a]ny other result would allow a purchaser to profit from his refusal of a valid tender for redemption. Rudulph is not entitled to interest on the redemption amount for the time in which this dispute has been pending."  *Watts*, 740 So.2d at 1088; *see generally Benefield v. Graham*, 992 So.2d 717, 724-25 (Ala.Civ.App. 2008) (trial court did not err by failing to require redemptioner to pay interest to purchaser through date that tendered funds were paid out by circuit clerk, where trial court reasoned that a purchaser "is not entitled to interest on the redemption amount for the time during which a dispute has been pending").

CS Assets does not now suggest (and has never argued) that First Financial failed to perform the statutory prerequisites for exercise of redemption privilege, that it failed to pay or tender sufficient funds into the court registry at the inception of this litigation, or that there is not a *bona fide* dispute of gargantuan proportions between the parties as to the proper redemption price under Alabama law.  Accordingly, this Court applies the *Pankey / Watts / Benefield* line of precedents, not only because they are interpreting the version of the statute that is currently in effect but also because their conclusions on this point are fair and equitable.[18]  Interest on the

---

[18]     CS Assets has made no attempt to distinguish *Pankey*, but has instead recited a number of authorities interpreting a predecessor redemption statute with a materially different interest provision.  *See Southeast Enterprises*, 720 So.2d at 876 (explaining that previous incarnation of redemption statute was "materially different from § 6-5-253(a)" in that it provided for one specific interest rate until tender, and another rate of interest for the period thereafter). To the extent that CS Assets would rely on *Southeast Enterprises*, in which the Alabama Supreme Court was also addressing the current redemption statute, the issue of the interest cutoff date was not presented; therefore, that decision is unilluminating on this point.  *See id.* at 875-76 (identifying aspects of trial court's interest ruling presented on appeal, with such issues not including any challenge to the propriety of awarding interest after the filing of the complaint and

$1.6 million purchase price will be awarded at the statutory rate of 12% from the date of the foreclosure sale (November 30, 2007) through the date of the Complaint's filing (November 7, 2008), for a total interest figure of **$179,934.43**.[19]

> **D.      Calculation of the Balance Due on the Debt.**

The third category of lawful charges at issue is the balance due on the debt.  The redemption statute provides that "[i]f the redemption is made from a person who at the time of redemption owned the debt for which the property was sold, the redemptioner ***must also pay any balance due on the debt***, with interest as aforesaid thereon to date."  Ala. Code § 6-5-253 (emphasis added).  Plainly, at the time First Financial exercised its privilege of redemption, CS Assets owned the debt for which the parcels were sold in foreclosure.  Therefore, First Financial is obligated to pay the balance due on the debt, plus interest, antecedent to redemption.  This apparently straightforward process is marred by the parties' inability to agree on (a) the amount of unpaid debt at the time of foreclosure, (b) whether that unpaid debt should be reduced by the value of Parcel F and if so through what methodology, (c) the amount of interest accrued on the debt, and (d) the late charges and attorney's fees that should be included in the redemption price.  Therefore, it is necessary for the Court to review all of these components of the misleadingly simple statutory categories of "balance due on the debt, with interest as aforesaid" to fix the redemption price.

---

tender of all disputed sums).  Finally, the Court notes that the equities favor halting the accrual of interest as of the date the Complaint was filed.  First Financial and CS Assets could not agree on the redemption price, so First Financial tendered the entire disputed amount (including amounts claimed by CS Assets that First Financial believed not to be due) into the court registry.  Since that time, First Financial has not had access to the money and has not been using it, any more than CS Assets has.  To punish First Financial by imposing a statutory interest rate (which far exceeds the paltry interest rates available to court registry funds in today's tenuous financial climate) on disputed funds that it has already tendered during the time period in which this dispute plays out is neither mandated by the redemption statute nor consistent with the statutory directive that courts "adjust all the rights and equities of the parties."  Ala. Code § 6-5-256.

[19]      The calculations are as follows: $1,600,000 times 12% per annum equals $192,000 in interest per year.  The interest accrued for 343 days, or 0.937 years (343/366), and $192,000 times 0.937 equals $179,934.43.

### 1.    *Unpaid Debt at the Time of Foreclosure.*

As an initial matter, First Financial and CS Assets are at loggerheads about the amount of the unpaid debt owed by West Beach to CS Assets at the time of foreclosure.  CS Assets begins with the $2,515,722 principal amount identified in the Renewal Promissory Note and Amendment to Mortgage and Security Agreement documents into which West Beach and CS Assets entered on April 30, 2007, when the original Heritage loan was modified and extended to avert impending foreclosure by CS Assets.  After tacking on interest payments through the date of foreclosure in the amount of $41,469.20,[20] CS Assets argues that the total balance on West Beach's debt to it as of November 30, 2007 was $2,557,191.20 (before backing out the $1.6 million foreclosure price) and that the redemption price must therefore include that amount, adjusted by the $1.6 million credit bid at foreclosure.

By contrast, First Financial maintains that the redemption price must exclude all new indebtedness accrued by West Beach to CS Assets pursuant to the CS Assets loan modification because that additional debt would be junior to the First Financial loan.  In other words, First Financial's position is that the redemption price should include only the portion of the CS Assets debt that is senior to the First Financial debt.  First Financial therefore advocates use of a priority analysis, and calculation of the unpaid debt based solely on the original Heritage note, which consisted of $2 million in principal plus $342,077.56 in accrued interest as of the November 30, 2007 foreclosure date.  This approach would exclude all new debt added to West Beach's obligations to CS Assets by virtue of the Renewed Promissory Note (which post-dated the First

---

[20]    This figure is reached as follows: The Renewal Promissory Note provides that interest on the unpaid balance shall accrue at 12% per annum, to be computed on the (agreed but counterfactual) basis of each year containing 360 days.  (Doc. 48, Exh. H.)  The interest rate jumps to 15% following a default lasting 10 days, with no reference to a 360-day computation method, such that the parties would apparently revert to a 365-day computation basis for accrued interest after a 10-day default.  (*Id.*)  The Renewal Note further provides that the entire principal balance (plus all accrued interest) was due and payable via a single balloon payment on October 19, 2007.  (*Id.*)  West Beach paid nothing at the maturity date; therefore, by the express terms of the Renewal Note, interest accrued at 12% for the 10-day period from October 19, 2007 through October 28, 2007, for a total of $8,385.74.  Then, interest accrued at 15% for the 32-day period from October 29, 2007 through the foreclosure date of November 30, 2007, which equates to $33,083.46.  Adding these two figures together yields a total interest balance of $41,469.20 as of November 30, 2007.

Financial loan to West Beach and therefore was junior to First Financial's mortgage).  According to First Financial, then, for purposes of the redemption price analysis, the unpaid debt at the time of foreclosure should be limited to $2,342,077.56.

Thus, the balance of unpaid debt included in the parties' proposed redemption prices differs by more than $200,000 (from CS Assets' $2,557,191.20 figure to First Financial's $2,342,077.56) based on the singular issue of whether concepts of priority and seniority matter in the redemption framework.[21]  First Financial proposes a priority framework, but identifies no authorities to support the propriety of applying priority notions here.  First Financial's position cannot be reconciled with the statutory language.

To be sure, in setting forth the lawful charges included in the redemption price, the Alabama statute specifies that "if the redeeming party is a ... junior mortgagee ... then all ... recorded mortgages ... having a higher priority" are lawful charges.  Ala. Code § 6-5-253(a)(4).[22] If the statute stopped there, then First Financial might have a point.  But the very next sentence provides that "[i]f the redemption is made from a person who at the time of redemption owned the debt for which the property was sold, the redemptioner *must also pay any balance due on the debt*."  *Id.* (emphasis added).  This language is unambiguous.  Reading the two sentences

---

[21]    Of course, whichever figure is used must be reduced by $1.6 million because the November 30, 2007 foreclosure sale lowered West Beach's debt to CS Assets by that amount via the CS Assets credit bid.  Both parties agree with that subtraction; however, they incorporate it into their respective analyses at different junctures.  To facilitate an apples-to-apples comparison, and to avoid confusion, the $1.6 million adjustment to West Beach's debt to CS Assets on account of the foreclosure sale will be performed after determining the total debt figure immediately prior to the credit bid.

[22]    This section is reinforced by another provision in the redemption statute that specifically addresses the subject of priority, indicating that when a "junior mortgagee redeems under this article, all recorded judgments, recorded mortgages and recorded liens *having a higher recorded priority* in existence at the time of the sale are revived ... *and such shall become lawful charges pursuant to Section 6-5-253(a)(4) to be paid off at redemption*."  Ala. Code § 6-5-248(c) (emphasis added).  There is no doubt that First Financial is a junior mortgagee and that all recorded mortgages on the property being redeemed that have a higher priority than First Financial's must be included among the lawful charges utilized in computing the redemption amount.  The question is whether any debts beyond those higher priority mortgages must also be included.

-17-

together, it is clear that (1) a junior mortgagee such as First Financial is on the hook for all higher priority debt in the redemption process, but (2) if redemption is made from the owner of the debt, the junior mortgagee must also pay any balance due on the debt. *See Southeast Enterprises*, 720 So.2d at 875 (explaining that, in its current form, the redemption statute "divides encumbrances into two categories: (1) those encumbrances paid or owned by the purchaser; and (2) all encumbrances of higher priority"). That is exactly the situation here. First Financial is a junior mortgagee seeking to make redemption from CS Assets, which owns the debt for which the West Beach parcels were sold. Under a straightforward reading of § 6-5-253(a)(4), First Financial must pay not only the higher priority debt, but also "any balance due on the debt" owned by CS Assets, without regard to priority considerations.[23]

Given this unambiguous statutory guidance, and First Financial's failure to rebut it or to explain how § 6-5-253(a)(4) could reasonably be construed to limit the redemption price in this case to higher priority debt, the entire balance that West Beach owed the purchaser (CS Assets) as of foreclosure must be paid as part of the redemption price.[24] That amount was $2,557,191.20, less the $1,600,000 in credit for the foreclosure sale, such that West Beach owed CS Assets the total of $957,191.20. Subject to modifications requested by First Financial and

---

[23]     Although CS Assets' briefs cite to this statutory language repeatedly in support of its position that priority is irrelevant in fixing the redemption price here, First Financial chooses to sidestep that issue. Nowhere in its summary judgment briefs has First Financial offered any explanation of § 6-5-253(a)(4) that might support a contrary result. This Court does not have the luxury of disregarding Alabama's redemption statute in adjudicating the rights of the parties as to a redemption process whose existence is wholly created by statute. Nor is it persuasive for First Financial to bandy about accusations of prejudice, to invoke notions of equity, and to cite authorities from Alabama and New York for the proposition that a senior mortgagee's modification agreement with a mortgagor results in the senior lienor relinquishing priority with respect to the modified terms. The redemption statute leaves no room to question that the full amount of the purchaser's debt (not just the priority portion) must be paid in redemption. The Court perceives nothing unfair or inequitable about enforcing that provision against First Financial here, even as to any portion of West Beach's debt to CS Assets that is subordinate to the First Financial loan.

[24]     *See generally Southeast Enterprises*, 720 So.2d at 879 (Butts, J., concurring in part) ("the Legislature's intent has always been for the redeeming party to have to pay the purchaser at the foreclosure sale only for those valid liens or encumbrances paid or owned by the purchaser") (emphasis omitted).

explored *infra*, that amount is properly included in the redemption price.

**2.       *Whether the Balance Owed is Reduced by the Value of Parcel F.***

Without a doubt, the most heated aspect of this dispute concerns the treatment of Parcel F in calculating the redemption price.  Thanks to the strategic decisions of both parties antecedent to and during this litigation, this case is now postured as one in which CS Assets purchased seven parcels at a foreclosure sale in a single transaction, but First Financial is exercising its redemption privilege as to only five of those parcels.[25]  The other two parcels (Parcel F and the Metes and Bounds Parcel) on which CS Assets foreclosed are not subject to redemption, and will be retained by CS Assets regardless of the outcome of this action.  This disconnect becomes critically important because Parcel F, the lone Gulf-front parcel, is by all accounts quite valuable.  First Financial asks to have the redemption price adjusted to account for the fact that CS Assets is retaining Parcel F; meanwhile, CS Assets insists that no such adjustment should be made and that First Financial should be required to pay the full purchase price and the full amount of the debt for all seven parcels (including Parcel F).

*a.       Partial Redemption Principles under Alabama Law.*

To ascertain whether a Parcel F credit is warranted, the Court begins by examining basic principles of Alabama law on partial redemption.  Alabama courts have stated, under both the current redemption statute and prior iterations, that partial redemptions are generally not

---

[25]       Recall that First Financial initially filed this action seeking to redeem all seven parcels (including the two parcels in which it lacked any legal interest) in order to negate any objection by CS Assets to an improper partial redemption.  But CS Assets balked at First Financial's efforts to perform a unified redemption on all seven parcels, citing the redemptioner's lack of interest in two of them.  Because the rule against piecemeal redemptions is in place to protect the purchaser (rather than the redemptioner), and because the purchaser in this case (CS Assets) made an objection that would force First Financial into a piecemeal redemption, the Court's dismissal of First Financial's claims to redeem Parcel F and the Metes and Bounds Parcel was subject to the express condition that CS Assets was prohibited from then objecting that First Financial was engaged in an improper piecemeal redemption.  Having made this bed (CS Assets, by objecting to a total redemption, and First Financial, by failing to obtain a mortgage that was co-extensive with the senior mortgage, in the first place), the parties now must lie in it, albeit at the price of muddying the waters and complicating the analysis considerably.  The bottom line is that, pursuant to the parties' actions and this Court's prior rulings in this case, the only parcels that First Financial may redeem are Parcels A through E.

permitted.  Indeed, the Alabama Supreme Court has consistently observed that "[t]he law does not allow piecemeal redemption, absent an agreement providing for it."  *Costa and Head (Birmingham One), Ltd. v. National Bank of Commerce of Birmingham*, 569 So.2d 360, 363 (Ala. 1990); *see also Warren v. Ellison*, 35 So.2d 166, 168 (Ala. 1948) ("where one seeks to redeem from a foreclosure where the property has been sold en masse, in the absence of an agreement between the parties, the foreclosure purchaser who has purchased the entire property at a single sale cannot be compelled to accept partial payment and release the premises *pro tanto*"); *Bank of Luverne v. Turk*, 133 So. 52, 53 (Ala. 1930) (summarizing earlier Alabama authorities as requiring redemptioner with interest in only a part of the mortgaged land "to pay the entire debt and redeem all the land and all interests, including such as he had not previously acquired").  "The rule requiring payment of the debt in full and forbidding a partial redemption is for the benefit and protection of the mortgagee. ... A redemptioner cannot compel a partial redemption over the insistence of the mortgagee that he redeem it all if any."  *Cooper v. Peak*, 61 So.2d 62, 66 (Ala. 1952) (citations omitted); *see also Bank of Luverne*, 133 So. at 53 (explaining that, even though "more equitable rule" would be to require redemptioner seeking to redeem only that portion of the land in which he had an interest to pay only a portion of the mortgage debt, this result would not be allowed because it "would have the effect of splitting the transactions into two parts without the consent of the mortgagee").

That is not to say, however, that a partial redemption is *per se* void.  To the contrary, even though it may be objectionable, "a partial redemption is certainly not void."  *Garris v. A & M Forest Consultants, Inc.*, 534 So.2d 577, 581 (Ala. 1988).  If the parties (and especially the purchaser, for whose protection the rule against piecemeal redemption exists) agree to it, it is clear that a partial redemption can in fact take place.  Indeed, if a purchaser does not insist upon an entire redemption, then "there can be no reason whatever why redemption in parcels may not be had, the purchaser being willing."  *Francis v. White*, 52 So. 349, 350 (Ala. 1910); *see also Costa and Head*, 569 So.2d at 363; *Warren*, 35 So.2d at 168.[26]

---

[26]      Notwithstanding all of these authorities, most of which were addressed in the Order entered on April 7, 2009, CS Assets' summary judgment brief states that it "firmly believes that partial redemption is not allowed under Alabama law."  (Doc. 59, at 17.)  Both this Court and the cited Alabama authorities have held otherwise; therefore, this argument will not be

        b.      *Having Demanded Partial Redemption, CS Assets Cannot Have*
              *Both Parcel F and Inclusion of the Entire Mortgage Balance in the*
              *Redemption Price.*

In sensitivity to the disfavored status of piecemeal redemption, First Financial initially brought this action seeking a total redemption of all seven parcels.  CS Assets could have assented to the total redemption, in which case there would be no partial redemption and CS Assets would have exchanged all seven parcels for a redemption payment that included the entire balance due on the debt for all seven parcels.  But CS Assets chose a different path, by objecting to the redemption of Parcel F and the Metes and Bounds Parcel on the grounds that First Financial lacked an interest in those parcels.  The Court upheld these objections and dismissed First Financial's claim for redemption as to Parcel F and the Metes and Bounds Parcel.  (*See* doc. 25.)  By confining First Financial's ability to redeem to Parcels A through E exclusively even though the underlying foreclosure sale embraced two other parcels, as well, CS Assets unilaterally split the transaction, creating a partial redemption scenario.  Through this conduct, CS Assets has effectively agreed to the partial redemption of Parcels A through E, and has waived any objections to same.[27]  First Financial continued to pursue this litigation after it was transformed into a partial redemption case, thereby conveying its assent to the partial redemption demanded by the purchaser.  Simply put, then, the parties find themselves in a piecemeal redemption situation because the senior mortgagee agreed to (and, indeed, insisted on) redemption of less than all of the foreclosed property, and the junior mortgagee elected to go forward with redemption despite that restriction.

Of course, to say that the parties agreed to a piecemeal redemption is not to say that they agreed on a redemption price.  Their extensive summary judgment briefing on their cross-motions emphatically demonstrates the contrary.  First Financial maintains that because this is

---

credited or considered further on summary judgment.

    [27]     The Order dismissing First Financial's redemption claims as to Parcel F and the Metes and Bounds Parcel was quite clear on this point, opining as follows: "Having effectively waived any right it had to insist that all seven parcels be included in First Financial's redemption, CS Assets cannot play a strategic game of 'gotcha' by protesting as this action goes forward that First Financial is engaging in an improper piecemeal redemption action."  (Doc. 25, at 10-11.)

only a partial redemption, the total unpaid debt component of the redemption price should be adjusted to reflect the fact that fewer than all parcels are being redeemed.  Meanwhile, CS Assets contends that no adjustment is appropriate and that First Financial must pay full freight even though it is receiving just a portion of the foreclosed property.  For two distinct reasons, the Court finds that First Financial has the better argument.

First, although neither side has submitted any Alabama authority delineating the mechanisms of the partial redemption process under the modern redemption statute, the extant Alabama caselaw points in favor of apportioning the mortgage balance.  Indeed, the Alabama Supreme Court has recognized, albeit in *dicta*, that "there may be a legitimate argument that partial redemption should not have been effected in this case, ***at least not without proper allocation of the mortgage balance between the two parcels***."  *Garris*, 534 So.2d at 581 (emphasis added); *see also Warren*, 35 So.2d at 168 (suggesting that where the parties have agreed to partial redemption, the foreclosure purchaser can "be compelled to accept partial payment and release the premises *pro tanto*").  The partial redemption issue referenced in *Garris* had not been preserved for appeal, so it was not definitively decided in that case.[28]  But Alabama courts previously indicated that where a partial redemption occurs by consent of the parties, the redemptioner need not pay the full amount while the purchaser retains a portion of the property. *See, e.g., Francis*, 52 So. at 350 (explaining that if complainant in bill to redeem is interested in only a portion of the property, and if he pays entire redemption on the full amount, then he "is entitled to hold the entire estate until he shall be reimbursed what he has paid beyond his just proportion," with the alternative being that "redemption in parcels may ... be had, the purchaser being willing"); *Lehman, Durr & Co. v. Moore*, 9 So. 590, 592 (Ala. 1891) (observing that, where redemptioner has a one-half undivided interest in the property, "the purchaser has a right to insist upon payment of the whole amount bid by him with interest and charges," but "it would be an anomaly, which the law does not contemplate and will not tolerate, to require [redemptioner] to make the purchaser whole in respect of all he has expended ... in consideration

---

[28]     Two years after *Garris*, the Alabama Supreme Court again declined to address "the issue of allowing a mortgagor to redeem a particular portion of mortgaged property when that mortgagor did not have any interest in the remaining portions of the tract" because that scenario was not presented.  *Costa and Head*, 569 So.2d at 364.

of the land, and at the same time leave half that consideration in his hands"). Both *Francis* and *Lehman*, along with the *dicta* in *Garris* and *Warren*, support the proposition that if, by agreement of the parties, redemption is had on only a part of the foreclosed lands, then the redemption price must reflect a credit to the mortgage balance so that the redemptioner pays only his just share.[29]

Second, it bears repeating that redemption is an equitable undertaking. The Alabama legislature hammered this point home in directing courts hearing redemption disputes to "settle and adjust all the rights and equities of the parties, as provided in this article." Ala. Code § 6-5-256; *see also Bank of Luverne*, 133 So. at 53 (in applying redemption statute in partial

---

[29]    On summary judgment, CS Assets overlooks these decisions and instead leans on cases such as *Burke v. Brewer*, 32 So. 602 (Ala. 1902), and *Richardson v. Dunn*, 79 Ala. 167 (1885). These decisions are unhelpful because they rely extensively on the language of a predecessor redemption statute. More fundamentally, both cases are distinguishable. In *Burke*, the redemptioner admitted that $6,345 "was the amount of the purchase money which was a charge upon the land sought to be redeemed." 32 So. at 602. Here there is no such agreement as to the amount of purchase money which is a charge on the land sought to be redeemed by First Financial. In *Burke*, the redemptioner sought a credit for the $1,600 that the purchaser had received in reselling one of the parcels after foreclosure even though "the money paid by [the subsequent purchaser] to [the foreclosure purchaser] was not his, and never could be." *Id.* Thus, the issue in *Burke* was not allocation of mortgage balance based on valuation at the time of foreclosure, but rather whether the redemptioner could receive a credit for the spoils of the foreclosure purchaser's subsequent sale of part of the property. That is not what First Financial is requesting here. There is no indication in *Burke* that the redemptioner was seeking an allocation of mortgage debt between two parcels to effect a partial redemption. In fact, *Burke* was not a case in which the foreclosure purchaser agreed to a partial redemption, or even a partial redemption case at all, given that one of the foreclosed parcels had already been sold to a third party and was not subject to redemption. *Richardson* is similarly divorced from the circumstances presented here. In *Richardson*, five parcels were sold at foreclosure, after which redemption was sought on four of them. The redemptioner followed the statutory procedure of providing notice and tendering the amount due, yet the foreclosure purchaser refused to accept tender or convey the property because redemption was sought on only four of the five lots. The *Richardson* court rejected the purchaser's position, noting that "tender made was for the whole amount bid" on all five parcels. 79 Ala. at 167. The issue of whether the redemption price could be affected by redemption of only four parcels was not presented in *Richardson*, and *Richardson* did not involve a partial redemption to which the purchaser had assented. As for CS Assets' citations to authority from other jurisdictions, the Court does not rely on them, given that (i) Alabama courts have written to the partial redemption issue sufficiently to provide adequate guidance, and (ii) redemption is a creature of statute, not common law, so what another court in another state might have said in applying another redemption statute to another fact pattern provides little utility in construing or applying the Alabama provisions here.

redemption context, court expressly relied on "our own theories of the equitable principles that should apply"); *Ross v. Rogers*, --- So.3d ----, 2009 WL 1643342, *6 (Ala.Civ.App. June 12, 2009) (recognizing that § 6-5-256 requires courts in redemption cases to "balance the equities between the parties").[30]  The approach advocated by CS Assets is simply not equitable.  When First Financial attempted to exercise redemption rights on all seven parcels and to tender the full balance of the debt, in deference to Alabama's disfavor of piecemeal redemptions, CS Assets balked.  Because of CS Assets' objection, this case was transformed into one for partial redemption.  When First Financial proceeded with that partial redemption, CS Assets insisted that the redemption price must be the same as it would have been if First Financial were redeeming all seven parcels, with the difference being that CS Assets gets to keep all of the money as well as two of the parcels.  Such an outcome smacks of unfairness and manipulation of the redemption process in an attempt to extract excess profits.

It strikes this Court that when First Financial pursued redemption as to all seven parcels, CS Assets had a choice.  It could have acquiesced to the complete redemption, and surrendered all seven parcels to First Financial in exchange for the full mortgage balance and other lawful charges.  Or CS Assets could have exercised its right to insist upon a partial redemption, allowing First Financial to redeem only the five parcels in which it had an interest in exchange for some portion of the mortgage balance.  Having selected the partial redemption option, CS Assets is nonetheless demanding the entire financial bounty of a full redemption.  To a court in equity, this approach is unpalatable.  CS Assets does not get to have its cake and eat it too.  It cannot protest First Financial's attempts to bring about a full redemption, and simultaneously collect the full price it would have received had it acquiesced to a full redemption.

In short, if CS Assets had wanted the full mortgage balance to be included in the redemption price, it could have received it, provided that it allowed First Financial to redeem all parcels to which that mortgage balance applied.  *See Bank of Luverne*, 133 So. at 53 (if redemptioner with interest in only part of the property pays entire mortgage debt, "he is entitled

---

[30]        In a similar vein, the Alabama Supreme Court has explained that "when a court takes jurisdiction for one purpose, it will extend that jurisdiction so as to do complete justice and will mold its judgment to adjust the equities of the parties and to meet the necessities of each situation."  *Garris v. Federal Land Bank of Jackson*, 584 So.2d 791, 794 (Ala. 1991).

to step into the shoes of the mortgagee to the extent of thereby acquiring all the security he holds for the debt"). As a matter of Alabama law and equity, CS Assets, by agreeing to (and indeed demanding) a partial redemption, cannot compel First Financial to nonetheless pay the full redemption price for less than all the property. Because CS Assets has postured this action as one for partial redemption, in which only Parcels A through E will be redeemed, First Financial is entitled to a credit for the value of the other parcels. The amount of that credit is hotly disputed, like all other aspects of the redemption price calculation herein, and will therefore require separate analysis.

c.      <em>The Proper Credit for Parcel F in the Redemption Price.</em>

As noted, Parcel F and the Metes and Bounds Parcel are not being redeemed. The parties argue at length over the proper adjustment to the redemption price that should be made for Parcel F; however, they are silent as to the Metes and Bounds Parcel. Nowhere in its memoranda does First Financial request a credit for the Metes and Bounds Parcel, nor do the parties point to any record evidence concerning the value of that parcel.[31] Accordingly, the Court's inquiry will focus solely on the credit to be made to the balance of the debt for Parcel F. This question

---

[31]      In fact, First Financial expressly takes the position that "[t]he value of the Metes and Bounds Parcel has no part in the redemption process." (Doc. 52, at 17.) Having so represented, First Financial cannot be heard to come back later and request a credit for the value of that parcel. Of course, the undersigned recognizes that First Financial made this statement in the context of a larger argument that only the original Heritage loan (as to which the Metes and Bounds Parcel was not security) matters in setting the redemption price, and that the Metes and Bounds Parcel is therefore irrelevant. But First Financial knew that whether the balance due would be calculated from the old Heritage loan or the modified CS Assets loan (which did encumber the Metes and Bounds Parcel) was a subject of profound disagreement between the parties, and that the Court might side with CS Assets on that point. To hedge its bet, First Financial could have argued in the alternative that, if the Court used the CS Assets loan rather than the original Heritage loan in calculating the balance due on the debt, a credit should be made for the Metes and Bounds Parcel in a specified amount. But First Financial chose not to do so. The Court will not explore arguments that the parties never made, nor will it look behind First Financial's representation that the value of the Metes and Bounds Parcel is irrelevant to the redemption process. The Court notes, however, that there is record evidence suggesting that the Metes and Bounds Parcel is "worth nothing" and that "you can't build on it" because it consists of landlocked wetlands. (Mosher Dep., at 38-39.) This testimony may shed light on the parties' lack of attentiveness to this parcel in making their valuation / credit arguments on summary judgment.

-25-

breaks down into a pair of sub-inquiries, to-wit: (a) what was the value of Parcel F on the date of the foreclosure sale, and (b) how should the value of Parcel F be credited against the outstanding balance owed (*i.e.*, dollar-for-dollar, proportionate, or some other method). The Court will address each of these issues in turn.

First Financial offers record evidence establishing the fair market value of Parcel F as $900,000 on the November 30, 2007 foreclosure date. (Hollon Aff., ¶ 4.)[32] First Financial also points to an appraisal cited by CS Assets in the *West Beach* Action that likewise fixed the value of Parcel F at $900,000 as of March 1, 2007. (Mosher Dep., Exh. 5, at Exh. G p. 25.)[33] In a Reply Brief, CS Assets unleashes a flurry of other appraisals fixing the value of Parcel F at varying amounts at different times. (Doc. 60, at 3-5.)[34] In a Reply Brief of its own, however, First Financial objects to all of those appraisals based on CS Assets' failure to comply with

---

[32]    The Hollon appraisal cited by First Financial also included market valuations for the other parcels as of November 30, 2007; however, those valuations differed depending on the zoning assumptions, given that the zoning for those parcels evidently changed from BTB (tourist lodging district) to BTB-1 (low density tourist business district) at some point. (Hollon Aff., Exh. 1, at 9.) According to Hollon, this zoning adjustment substantially reduced the value of Parcels A through E (from $5.74 million to $3.6 million) and also affected the value of the Metes and Bounds Parcel (from $560,000 to $400,000). (*Id.* at III.) By contrast, the zoning on Parcel F remained unchanged as R1-B (medium density single family residential district) throughout the relevant time period, so its value was unaffected by the change in zoning.

[33]    This appraisal commissioned by CS Assets appears to have valued Parcels A through E and the Metes and Bounds Parcel, collectively, at $1.5 million as of March 1, 2007. (*Id.*) The March 2007 appraisal reflects a zoning of BTB-1 for those parcels. The record also shows that CS Assets generated its $1.6 million foreclosure bid for all seven parcels by reference to that appraisal, as follows: "In CS Assets' view, $1.6 million, which is two-thirds (66.6%) of the $2.4 million valuation, was an appropriate bid at the foreclosure sale ...." (Mosher Dep., Exh. 5, at ¶ 12.)

[34]    For example, Matthew Piell (a West Beach principal) opined that the market value of Parcel F was $1 million as of November 30, 2007. (Piell Aff., ¶ 15.) Rodger Lowery determined that the retrospective market value of Parcel F was $750,000 as of November 30, 2007, with a "quick sale value" of $487,500. (Doc. 60, Exh. 6, at Exh. A p. vi.) CS Assets manager John Mosher testified that his opinion of the value of Parcel F was that it was worth between $600,000 and $650,000 as of his September 2009 deposition. (Mosher Dep., at 38-39.)

-26-

applicable disclosure and discovery requirements.  (Doc. 61, at 1-3.)[35]  First Financial shows that CS Assets never identified the persons who prepared these appraisals as expert witnesses in this case, never identified certain of them as witnesses at all, stated in interrogatory responses that it had no contention as to the value of any parcel, and denied having any expert disclosures of opinions other than those of a Mr. Watson, pertaining solely to the Metes and Bounds Parcel. These procedural infirmities are well-documented in the record,[36] and have not been rebutted.

_____

[35]    CS Assets never requested leave to be heard in response to these objections; therefore, the Court does not have the benefit of defendant's position on those objections.  It is not the place of this Court to step into the shoes of a litigant on summary judgment and to formulate arguments that, for whatever reason, the party chose not to make.  In that regard, the undersigned expressly "decline[s] to assume the role of counsel and make a new argument for" the parties.  *United States v. Docampo*, 573 F.3d 1091, 1103 (11th Cir. 2009); *see also Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments ....") (citation omitted); *Pinto v. Universidad De Puerto Rico*, 895 F.2d 18, 19 (1st Cir. 1990) ("the court is under no duty to exercise imagination and conjure what a plaintiff might have alleged, but did not, and do counsel's work for him or her"); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 299 n.57 (S.D. Ala. 2006) (where parties have not articulated a theory for liability, "the Court will not formulate their arguments for them").

[36]    For example, when asked in interrogatories to state its positions or contentions as to value of each parcel, CS Assets answered, "No contention at this time."  (Doc. 62, Exh. B, at #4.)  When asked to identify persons with knowledge about this matter, CS Assets omitted Matthew Piel's name from both its initial disclosures and discovery responses.  (Doc. 62, Exh. A, at #1; doc. 62, Exh. B, at #1.)  In his deposition, when asked whether CS Assets had disclosed any experts or valuations as to Parcel F, Mosher testified, "I'm not aware of any opinion of experts that have been provided on the gulf front lot. ... I'm not aware of any other disclosure about the gulf front lot."  (Mosher Dep., at 36.)  Mosher answered the same way as to Parcels A through E, and specifically explained that he "did not want to incur the cost to retain an expert to appraise each of the parcels."  (*Id.* at 36-37.)  So after telling First Financial that it had no contentions as to valuation of the specific parcels, after identifying only an expert concerning valuation of the Metes and Bounds Parcel, and despite not disclosing any other expert reports, CS Assets on summary judgment flooded the record with appraisals on which it purports to rely to establish alternative valuations for various parcels.  This is improper, and in violation of Rule 26.  What's more, in the face of First Financial's objection, CS Assets has made no effort to defend or explain these actions.  For all of these reasons, the appraisal and valuation materials cited by CS Assets on pages 3 and 4 of document 60 will not be considered on summary judgment.

Accordingly, the valuations offered by CS Assets on summary judgment will be excluded pursuant to Rule 37(c)(1), Fed.R.Civ.P. (where a party fails to disclose or supplement material required by Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion ..." absent showings that have not been made here).

Taking stock of what has been decided so far, the undersigned has found that First Financial is entitled to a credit for the value of Parcel F against the outstanding balance of the debt owed, and that the only proper record evidence concerning Parcel F establishes its market value as $900,000 as of the date of foreclosure.[37]  The remaining question is how that valuation should be credited against the balance of the indebtedness.  Once again, as in seemingly every other facet of the redemption process, the parties' positions rest on opposite ends of the spectrum.  First Financial contends that the West Beach indebtedness should be reduced by the value of Parcel F on a dollar-for-dollar basis.  By contrast, CS Assets' position is that, if the purchase price is to be apportioned to account for Parcel F, "the Court should focus on the

---

[37]        In one of its briefs, CS Assets poses a series of rhetorical questions about the proper date of valuation, to-wit: "Why is it appropriate to use the date of foreclosure as the date for assessment of value?  Why not the date the loan was made?  Why not today?"  (Doc. 60, at 7.)  These queries, which CS Assets does not attempt to answer or develop, are not helpful, particularly where they are not backed by any proposal, argument or reasoning in support of a specific valuation date.  This Court has agreed with First Financial that, as a matter of both law and equity, a credit should be applied to the redemption price to account for CS Assets' retention of Parcel F.  The Court understands that CS Assets disagrees with that approach; nonetheless, now that the Court has adopted it, CS Assets accomplishes nothing by attacking First Financial's proposed valuation methodology without offering any alternative.  Using the foreclosure date (as First Financial has) as the operative valuation date for Parcel F is well-grounded in logic; after all, that is the date on which CS Assets acquired an asset (*i.e.*, Parcel F) which offsets the balance owed on West Beach's debt for redemption purposes.  Common sense suggests that Parcel F offset that indebtedness effective the date that CS Assets acquired it, not months or years before or after, such that the date of acquisition should be used as the operative date for calculating the credit for that parcel.  In the face of that reasonable approach, CS Assets blithely asserts that other valuation dates are possible, without arguing in favor of any of them or showing why they might be preferable to the foreclosure date.  As stated repeatedly herein, the Court will not make or develop a party's arguments for it on summary judgment.  Inasmuch as the November 30, 2007 date appears well-suited as a proper valuation date for purposes of applying a credit for the value of Parcel F, and inasmuch as CS Assets has presented neither convincing reasons why that date is not appropriate nor a proffered alternative date that would be more suitable, valuation will be examined as of the November 2007 foreclosure sale.

proportion of the value of the property sought to be redeemed to the value of the unredeemed property."  (Doc. 59, at 17.)

Unfortunately, neither the redemption statute nor the case authorities identified by the parties in their extensive summary judgment briefing shed meaningful light on which methodology is appropriate.[38]  The Court is left to fall back on the balance of the equities, pursuant to Alabama Code § 6-5-256.  In weighing those equities, it is important to remember the purpose of this aspect of the redemption exercise.  Given the parties' agreement to a partial redemption, the task before us is to determine the "balance due on the debt" for the parcels being redeemed, which balance will then be included in the redemption price pursuant to § 6-5-253.  As explained in Section IV.D.1., *supra*, when the foreclosure sale was concluded, West Beach owed CS Assets a total unpaid balance of $957,191.20, which had been secured by Parcels A through F and the Metes and Bounds Parcel.  That debt did not differentiate or prioritize among the seven mortgaged parcels, and was not allocated among those parcels in any particular manner by West Beach or CS Assets.  Given this backdrop, to engage in the kind of dollar-for-dollar credit that First Financial proposes would be to indulge an inequitable fiction.  It's a fiction because there is neither evidence nor any reason to believe that West Beach's unitary indebtedness to CS Assets elevated Parcel F above any of the other parcels, or that the portion of that debt allocable to Parcel F was any greater or any lower than Parcel F's proportional share in the value of all seven parcels as a whole.  It's inequitable because implementing a dollar-for-dollar adjustment for the market value of Parcel F would effectively transform a $957,000 unpaid balance covering seven parcels into a $57,000 debt covering six parcels, with First

---

[38]  To be sure, CS Assets cites *Pitts v. American Freehold Land Mortg. Co. of London*, 47 So. 242 (Ala. 1908), in support of its proposed proportional credit method.  But the proportionality language in *Pitts* quoted by CS Assets (albeit in truncated and out-of-context fashion) is expressly confined to attorney's fees and costs of foreclosure, not adjustment of the balance on the mortgage debt.  *See Pitts*, 47 So. at 244 ("It should be also ascertained, by reference, what portion of the attorney's fee and costs of foreclosure sale should be borne by [each party] ...; and the portion thereof to be paid by complainants should be in the proportion that the value of the remainder sought to be redeemed bears to the combined values of the" property as a whole).  Thus, the quoted portion of *Pitts* says nothing about the proper means of crediting the value of non-redeemed parcels against the balance due on the debt in a partial redemption context.

Financial reaping the benefits in the form of a drastically lower redemption price for Parcels A through E. It would be unfair to allocate almost all of the balance of the debt to Parcel F and almost none of it to the other six parcels that likewise secured that debt.[39]

To alleviate this inequitable fiction, the Court will utilize a proportional-value method of crediting Parcel F against the balance due on the debt.[40] First Financial's own expert, Michael Hollon, has offered unrebutted evidence on summary judgment (CS Assets' appraisal and valuation evidence having been barred pursuant to Rule 37(c)(1)) that at the time of foreclosure, the seven parcels as a whole had a market value of $4,900,000 under the revised zoning status, with Parcel F having a market value of $900,000.[41] Thus, the market value of Parcel F

_____

[39] As CS Assets observes, it is hardly a stretch to conceive of circumstances in which the dollar-for-dollar methodology championed by First Financial would result in the redeeming party paying nothing for the "balance due on the debt" category of charges mandated by statute. For an eminently plausible example, suppose the market value of Parcel F was $1,000,000, rather than $900,000. That figure exceeds the $957,000 balance due on the debt as of foreclosure. Under First Financial's proposed framework, not only would the redemptioner owe CS Assets zero dollars on the balance of the debt, but presumably CS Assets would be obligated to pay First Financial a rebate for the $43,000 excess of the market value of the parcel being retained over the balance of the debt owed. Such a result (in which the purchaser at foreclosure is rebating funds to the redemptioner even as the latter takes title to the purchaser's property) would be nonsensical and would violate the clear spirit of the redemption statute, yet it would be entirely possible (and, indeed, inevitable) under the First Financial dollar-for-dollar proposal.

[40] Once again, the parties' briefs fall short in advocating any specific proposals for how to accomplish these calculations. CS Assets urges the Court to use a proportionality methodology if a credit is to be allowed, but offers no specifics for the implementation of same. Meanwhile, First Financial argues against a proportionality methodology, but fails to make any proposal in the event the Court decides that a proportional approach is appropriate. Thus, both parties have left the mechanics of the proportional valuation procedure (an issue which is specifically joined on summary judgment) to the Court's own devices, without contributing a single idea for how it should be done. Having squandered their opportunity to make specific proposals on this point, the parties cannot subsequently be heard to complain that the Court's selected methodology is not to their satisfaction.

[41] Of course, CS Assets could have argued (but did not) that Hollon's other appraisal of $7,200,000 based on the original zoning status of those parcels would be more appropriate. (Doing so would reduce the proportional value of Parcel F relative to the package of parcels as a whole, by lowering the fraction from 900,000/4,900,000 to 900,000/7,200,000.) However, the unrebutted statements of Hollon are that the new zoning was originally to take

-30-

accounted for 18.37% (or 900,000 / 4,900,000) of the market value of the package of seven parcels at the time of foreclosure. As a matter of equity, the Court will therefore credit 18.37% of the balance due on the debt against the total redemption price to account for CS Assets' retention of Parcel F. The arithmetic ($957,121.20 x 0.1837) leads to a credit of $175,823.16. When that figure is subtracted from the $957,121.20 balance owed on the debt, the resulting adjusted balance owed on the debt as of the foreclosure date is **781,298.04**. That amount will be added to the redemption price for the "balance due on the debt" category of charges pursuant to Alabama Code § 6-5-253.

### 3. Accrued Interest on the Debt.

The next category of lawful charge prescribed by Alabama's redemption statute is the interest accrued on the balance on the debt. In particular, the statute calls for the redemptioner to "pay any balance due on the debt, *with interest as aforesaid thereon to date.*" Ala. Code § 6-5-253 (emphasis added). As before, the parties dispute the period of time during which interest should run, with CS Assets seeking interest accrual all the way through the present and First

---

effect in July 2005, and that a final deadline of July 18, 2007 was fixed by the Gulf Shores Planning & Zoning Commission for any permit applications seeking to travel under the old zoning requirements. (Hollon Aff., Exh. 1, at 5.) In March 2008, an announcement was made extending that deadline further; however, as of the November 30, 2007 foreclosure date, it is undisputed that the previous deadline for availing oneself of the old zoning provisions had expired and that no further extension of the deadline had been announced. Thus, as of November 30, 2007, all indications were that Parcels A through E and the Metes and Bounds Parcel were zoned as BTB-1, the more restrictive zoning status than the previous BTB. For that reason, it is appropriate to use Hollon's BTB-1 appraisal figure, rather than his BTB valuation, because that corresponds to the properties' actual zoning status on that date.

Similarly, to the extent that First Financial might attempt to reduce the denominator of the fraction from $4.9 million to $2.5 million by relying on the Farmer appraisal included in their summary judgment exhibits, the Court declines that proposal. By all accounts, Hollon is First Financial's expert appraiser. First Financial retained Hollon to perform the retrospective appraisal in connection with this lawsuit and submitted his results on summary judgment as its litigation position on valuation. Having done so, First Financial will not be heard to clamor for the disregard of Hollon's appraisal values for Parcels A through E and the Metes and Bounds Parcel, or for the substitution of other values from other appraisers not retained by First Financial whose results might be more to First Financial's liking given the manner in which the summary judgment analysis has evolved. Plaintiff will not be permitted to pick and choose the parts of its own expert's testimony it wants to implement, asking the Court to accept some of it and reject other portions of it, all to maximize plaintiff's advantage.

Financial maintaining that interest ceased accruing on the date that this redemption action commenced.  The Court has already decided this question in First Financial's favor in Section IV.C., *supra*, and the reasoning set forth there applies with equal force here.[42]  Accordingly, the Court finds as a matter of law that interest accrues on the balance due on the debt only from the November 30, 2007 foreclosure date through the date on which this redemption action was filed (November 7, 2008).

As for the applicable rate of interest, the redemption statute specifies that interest accrues "at the rate allowed to be charged on money judgments as set forth in Section 8-8-10."  Ala. Code § 6-5-253.  The cited section in turn provides that money judgments, "if based upon a contract action, bear interest ... at the same rate of interest as stated in said contract; all other judgments shall bear interest at the rate of 12 percent per annum."  Ala. Code § 8-8-10.  The Alabama Supreme Court has endorsed the proposition that a rate of interest fixed by contract takes precedence over the fixed legal rate in the redemption context.  *See Southeast Enterprises*, 720 So.2d at 876-77 ("If a portion of the redemption price is composed of a debt for which the interest rate is fixed by contract (*e.g.*, a note), the contract rate would apply in lieu of the fixed legal rate.").  The Renewal Promissory Note executed between West Beach and CS Assets called for an interest rate of 15% per annum on all balances in default 10 days or more.  (Doc. 48, Exh. H, at 1.)  The balance of the debt owed clearly flows from that Renewal Note.  Therefore, interest accrues on the balance owed on the debt for redemption purposes at the contract rate of 15% rather than the fixed statutory rate of 12%.  First Financial does not argue otherwise.

Computing interest on the balance due on the debt at the rate of 15% from the date of the foreclosure sale (November 30, 2007) through the date of commencement of suit (November 7, 2008) yields an interest figure of **$109,811.44**.[43]  That figure will be added to the redemption

---

[42]    The statute's use of the language "interest ... to date" does not alter this conclusion.  The Court construes "to date" as meaning the date of redemption, which Alabama courts fix as the date on which the complaint to redeem was filed, not the date of entry of final judgment.  *See Pankey*, 671 So.2d at 689.

[43]    This calculation was reached as follows: From an adjusted balance due on the debt of $781,298.04, a 15% interest rate equates to $117,194.71 in interest per year.  Interest accrued for 343 days, or 0.937 years (343/366), from the foreclosure date through the complaint

price.

### 4.     *Attorney's Fees and Late Charges.*

Next, the parties clash over CS Assets' contention that attorney's fees and late charges relating to nonpayment and recovery of the West Beach debt should be incorporated into the redemption price.  The Court will consider each of these items in turn.

#### a.     *Attorney's Fees.*

With respect to attorney's fees, CS Assets seeks to include in the redemption price the sum of $50,000 in attorney's fees and expenses it incurred in the foreclosure action and the *West Beach* Action in the Northern District of Alabama to obtain a deficiency judgment against West Beach.  First Financial concedes that "the attorney's fees payable upon redemption are to be awarded in the Court's discretion."  (Doc. 52, at 20.)  Thus, it is not contested that the *West Beach* Action attorney's fees are a proper element in computing the redemption price here.[44] And despite First Financial's criticism that CS Assets "has provided no satisfactory itemization of its claim for attorney's fees" (doc. 52, at 21),[45] it has failed to come forward with any evidence

---

date, and $117,194.71 times 0.937 equals $109,811.44.

[44]      There is Alabama authority for the proposition that, where the underlying mortgage contains an attorney's fee provision, the purchaser's reasonable attorney's fees incurred in foreclosure are properly added to the redemption price.  *See Lytle v. Robertson*, 170 So. 484 (Ala. 1936).  First Financial challenges neither the veracity of this point of law nor CS Assets' contention that its mortgage with West Beach contained just such a provision.  Indeed, an attorney's fee provision is set forth in the Heritage Mortgage and Security Agreement.  (*See* doc. 48, Exh. B, at § 1.16.)

[45]      This objection is difficult to comprehend.  Nothing in Rule 56 requires a party to present evidence in the form preferred by opposing counsel.  CS Assets has presented the declaration of its manager that attorney's fees in the stated sums were incurred.  That is sufficient for summary judgment purposes, and no itemization is necessary for that figure to be credited.  Besides, First Financial had the benefit of a full discovery period in this case to explore the factual underpinnings of all of the lawful charges sought by CS Assets.  If First Financial now lacks information about itemized attorney's fees, it can only be because First Financial either (a) failed to ask appropriate questions in discovery to elicit this information, or (b) failed to file a motion to compel if its discovery inquiries on this topic went unanswered.  Either way, First Financial has only itself to blame for any lack of specificity in the attorney's fees data in its possession at this time, and cannot be heard to complain now of the purported inadequacy of same.

or argument suggesting that itemization is necessary or that there are genuine issues of material fact as to the veracity and reasonableness of CS Assets' accrual of $50,000 in attorney's fees and expenses in connection with foreclosure and deficiency proceedings against West Beach.[46]

Where the parties part company on the attorney's fee issue is on the question of apportionment. First Financial wants those fees to be apportioned based on the partial redemption nature of this case. CS Assets does not. Alabama courts have plainly allowed apportionment of attorney's fees and expenses in partial redemption cases. More than a century ago, the Alabama Supreme Court explained that "[i]t should be also ascertained ... what portion of the attorney's fee and costs of foreclosure sale should be borne by the respondent, and what by the complainants coming to redeem their remainder; and the portion thereof to be paid by complainants should be in the proportion that the value of the remainder sought to be redeemed bears to the combined values" of the foreclosed parcels. *Pitts v. American Freehold Land Mortg. Co. of London*, 47 So. 242, 244 (Ala. 1908). Both sides have cited *Pitts* for this very proposition at various points in their summary judgment briefs. (Doc. 56, at 6; doc. 59, at 17.)[47]

Accordingly, the Court will follow the *Pitts* guidance, both as a matter of law and based on the equities of having First Financial bear responsibility only for that portion of CS Assets'

---

[46]       It bears noting that the Final Judgment entered in the *West Beach* Action specifically awarded the sum of "$50,000.00 which the court finds to be reasonable attorneys' fees and expenses." (Doc. 48, Exh. L, at ¶ 2.) CS Assets' position is that it actually incurred fees and expenses exceeding $78,000 in the foreclosure and deficiency actions, and it submits record evidence purporting to show same. (Doc. 48, at 19 n.37; doc. 49, Exh. M, at ¶ 10.) Nonetheless, CS Assets states that "[i]n deference to said final judgment" entered in the *West Beach* Action, it "is revising the amount sought in connection with the redemption by First Financial to Fifty Thousand Dollars ($50,000.00) in attorney's fees and expenses." (Doc. 48, at 19 n.37.) On that basis, the attorney's fee portion of the redemption price will be capped at $50,000 in this case.

[47]       Remarkably, in the same brief in which CS Assets quotes this passage from *Pitts* in favor of an apportionment scheme, it states that "Alabama law and equity ... do not allow for the apportionment of such lawful charges in the case of a partial redemption." (Doc. 59, at 28.) In so arguing, CS Assets contradicts its reliance on *Pitts* for apportionment just 11 pages earlier in the same memorandum. In any event, *Pitts* is both clear and persuasive on this point, and the Court finds that both Alabama law and equity support apportionment of attorney's fees in this case in the manner prescribed by *Pitts*.

attorney's fees and expenses relating to the particular parcels it is redeeming.  In Section

IV.D.2.c., *supra*, the Court computed the market value of Parcel F relative to the market value of

all parcels at issue as being 18.37%.  As such, the attorney's fees included in the redemption

price will be reduced by 18.37% to apply the apportionment principles espoused in *Pitts*.  The

arithmetic ($50,000 x 0.8163) yields a lawful charge of **$40,815.00** in attorney's fees, which will

be included in the redemption price.[48]

*b.    Late Charges.*

As for late charges, the parties' debate proceeds along largely similar lines to those

addressed in the attorney's fee context.  The Renewal Promissory Note executed by West Beach

and CS Assets contains a provision stating that if principal and interest are not paid at maturity

or at acceleration, West Beach agrees "to pay a late charge equal to 5% of the total debt

(principal plus interest)."  (Doc. 48, Exh. H, at 1.)  The Final Judgment entered in the *West

Beach* Action "allowed a reasonable late charge penalty of $60,000.00."  (Doc. 48, Exh. L, at 1

n.1.)  CS Assets now seeks inclusion of that $60,000 late charge in the redemption price.[49]  The

---

[48]    The Court recognizes, of course, that First Financial was requesting
apportionment on a different theory than that set forth above.  In particular, First Financial
sought to reduce the attorney's fee charge to $28,098, based on an unexplained calculation "in
proportion to how the original Heritage Bank debt relates to the total debt at issue in the
deficiency case."  (Doc. 52, at 20-21.)  In Section IV.D.1., *supra*, the undersigned specifically
rejected First Financial's attempts to confine its redemption payment obligations to the original
Heritage debt rather than the full CS Assets debt.  In light of that determination, it would be
inappropriate to apportion attorney's fees or any other lawful charges based on the percentage of
funds sought by CS Assets in the *West Beach* Action that related to the original Heritage loan
rather than the restructured CS Assets loan.  Notwithstanding First Financial's incorrect
approach to apportionment, it did cite the apportionment language from *Pitts*; therefore, the
Court construes First Financial's position as also including a request for apportionment of the
sort conducted in *Pitts*, which is precisely what has been done *supra*.

[49]    As with attorney's fees, it appears that the Final Judgment in the *West
Beach* Action discounted the late charges awarded from the figure originally requested by CS
Assets.  After all, a straight 5% late charge calculated against the principal of $2,515,722 (the
amount owed under the Renewal Promissory Note at maturity) would yield a figure of $125,786,
yet the late charge awarded in the *West Beach* Action was less than half of that amount.  Be that
as it may, CS Assets in this action requests a late charge of just the $60,000 amount awarded in
the *West Beach* Action, so the Court will not consider whether a higher amount could have been
included in the redemption price.

legal basis for this request is that, under Alabama law, late charges are considered a form of interest, whose enforceability is "limited only by principles of unconscionability." *Cantrell v. Walker Builders, Inc.*, 678 So.2d 169, 173 (Ala.Civ.App. 1996) (recognizing that "late charges may be treated as provisions for interest upon the underlying obligation" for loans exceeding $2,000, pursuant to Ala. Code § 8-8-5). There has been, and can reasonably be, no suggestion that a $60,000 late charge under the CS Assets / West Beach loan agreement (amounting to less than 2.5% of the principal that West Beach had failed to pay) was unconscionable. Because interest is properly awarded as a category of lawful charges in the statutory redemption scheme, and because the late charge in question here is properly viewed as a form of interest, that late charge may be included in the redemption price.

For its part, First Financial states that "it is agreeable to paying a late charge based on the $60,000.00 awarded in the deficiency litigation," subject to the same kind of apportionment it requested in the attorney's fees context. (Doc. 52, at 20.) As stated in the attorney's fee section, the Court agrees that a *Pitts* analysis is appropriate, rejects CS Assets' self-contradictory contention that apportionment of late charges in the *Pitts* manner is not permitted under Alabama law and equity, rejects First Financial's nebulous request for apportionment based on the relative fraction of funds sought under the original Heritage loan to those sought under the modified CS Assets loan, and performs apportionment calculations in precisely the same manner as it did on the attorney's fees category. Multiplying the $60,000 late charge by 0.8163 (the share of the late charge not attributable to Parcel F in this partial redemption case), the Court finds that the late fee charge properly included in the redemption price equals **$48,978**.[50]

---

[50] In debating the late charge line item on summary judgment, CS Assets requests only the $60,000 referenced in this section. Nonetheless, First Financial uses the late charge topic as a point of departure for insisting that CS Assets is actually attempting to recover two late charges, the $60,000 discussed previously "but as well, another late charge equal to $100,825.00 imbedded in its recalculation of the original Heritage Bank debt," which First Financial decries as a "doubling up of charges." (Doc. 52, at 20.) This argument is meritless. In the first place, this argument should not have been made under the heading of late charges (where CS Assets seeks only $60,000), but should instead logically have been included in First Financial's arguments addressing the balance due on the debt because that "late charge" actually appears in the "balance due on the debt" category of lawful charges in this case, and has thus already been awarded. Second, First Financial mis-classifies the $100,825 amount as a double-dipping late

E.      *Credit for Property Taxes Paid by First Financial.*

Having worked through the various statutory components of the redemption price, the Court's work is not yet finished.  First Financial requests a credit for certain property taxes it paid on Parcel F and the Metes and Bounds Parcel.  In keeping with the parties' scorched-earth mantra in this case, CS Assets opposes that request.  The Court therefore will intercede on this aspect of the dispute, as well.

The uncontroverted evidence is that in January 2009 (several months after First Financial commenced this redemption action but several months before the dismissal of its claims for redemption of Parcel F and the Metes and Bounds Parcel), First Financial "paid the property taxes that were due on all parcels described in its complaint." (Province Aff., ¶ 6.)  Such taxes included the sum of $27,767 in property taxes due for Parcel F and the Metes and Bounds Parcel. (*Id.*)  At the time that First Financial paid those taxes, it was in fact seeking redemption of those parcels.  Of course, subsequent events in this litigation extinguished First Financial's claims for redemption of Parcel F and the Metes and Bounds Parcel.  In light of these events, First Financial requests a setoff of $27,767 from the redemption price to account for this tax payment, which worked directly to the benefit of CS Assets by relieving CS Assets of the obligation to pay 2009 taxes for real property it owns.

---

charge, when it is properly viewed as "balance due on the debt" pursuant to § 6-5-253.  When CS Assets and West Beach agreed to modification of the underlying Heritage loan, there was an outstanding late charge of $100,825 due on that loan.  (Doc. 59, Exh. 4, at ¶ 14.)  As part of the loan modification process, CS Assets and West Beach agreed to roll that $100,825 into the principal of the revised loan, such that the $100,825 became subsumed under, and part of, the $2,515,722 principal amount in the Renewal Promissory Note.  (Mosher Dep., Exhs. 12, 13, 15, 16, 18.)  Thus, as of the April 30, 2007 execution of the renewal/modification documentation, the $100,825 was no longer a late charge, but rather was a part of the "balance due on the debt" which West Beach expressly agreed to have included in the principal.  In light of these circumstances, First Financial's contention that the $100,825 is a duplicative "late charge" that should be carved off of the principal balance amount is irreconcilable with the facts.  Likewise, First Financial's suggestion that the $100,825 should be disallowed on unconscionability principles is baseless.  There is nothing unconscionable about a debtor (West Beach) agreeing that an admittedly-owed late charge of $100,825 should be rolled into a new modified loan principal amount, with an additional late charge being imposed if the modified loan is not paid in a timely fashion.  Recall that the loan modification redounded to West Beach's benefit by allowing it to avert immediate foreclosure based on a debt that it could not then repay.

Faced with this facially reasonable request for a minor adjustment of the total redemption price to account for a payment made by First Financial in good faith that inured wholly to CS Assets' benefit, CS Assets nonetheless objects.  According to CS Assets, First Financial "acted as a volunteer" when it paid the taxes, so it is simply out of luck.  (Doc. 59, at 28; doc. 60, at 15.) CS Assets is correct that Alabama courts have generally declined to order restitution to a party for a purely voluntary payment.  *See, e.g., CIT Communication Finance Corp. v. McFadden, Lyon & Rouse, L.L.C.*, --- So.3d ----, 2009 WL 3517603, *11 (Ala. Oct. 30, 2009) ("a party who voluntarily pays sums without objection [with full knowledge of all the facts] cannot subsequently maintain a ... claim to recover the funds paid absent fraud, duress, [or] extortion") (citations omitted).  However, CS Assets' reliance on the voluntary-payment doctrine is unavailing here.  Simply put, it is inaccurate to characterize First Financial as a mere volunteer at the time it paid the property taxes on Parcel F and the Metes and Bounds Parcel.  When First Financial made those payments, it had active, pending claims for redemption of those two parcels, such that it was acting to protect a possible interest in them.  As explained *supra*, absent objection by CS Assets, First Financial could and would have redeemed all seven parcels in accordance with Alabama's preference for full redemptions.  What's more, in the course of that redemption, First Financial would have been legally responsible for paying any taxes on those parcels.  *See* Ala. Code § 6-5-253(a)(2) (listing "[t]axes paid or assessed" as lawful charges that must be included in the redemption price, along with interest on same).  These circumstances distinguish this case from the "mere volunteer" scenario that CS Assets invokes.  *See generally Sykes v. Sykes*, 78 So.2d 273, 280-81 (Ala. 1954) ("The averments of the complaint clearly indicate that complainant paid out moneys for the benefit and protection of the real estate in the belief that she was the equitable owner of the property and, therefore, had an interest to protect. The contention that the bill shows her to be a mere volunteer is without merit.").[51]

_____

[51]    Another way of looking at this question is in terms of the mistake exception to the voluntary payment doctrine.  It is clear that "Alabama law recognizes a mistake exception to the voluntary payment defense" and that "money voluntarily paid under a mistake of fact may be recovered, even where the party paying had means of ascertaining the real facts."  *CIT Communication*, 2009 WL 3517603, at *11 (citations and internal quotation marks and brackets omitted).  Here, the mistake was that First Financial apparently did not know that CS Assets was going to reject a full redemption of all seven parcels, but was instead going to demand a

More generally, taking a step back from the minutiae of the voluntary payment doctrine, the Court remains acutely aware of the Alabama legislature's directive that it "settle and adjust all the rights and equities of the parties" in redemption. Ala. Code § 6-5-256. First Financial made a tax payment that relates exclusively to the two parcels not being redeemed in this action. Based on subsequent developments, this tax payment redounds wholly and exclusively to the benefit of CS Assets, by essentially giving it a free ride for 2009 property taxes on the two foreclosed parcels it is retaining. There is no equity in the contention that First Financial should be denied a credit for this relatively small line item as to which CS Assets is reaping the full benefit.

For all of these reasons, the Court will include an offset in the redemption price in the amount of **$27,767** as a credit for the tax payments that First Financial made for CS Assets' advantage on Parcel F and the Metes and Bounds Parcel.

### F.    *First Financial's Request for Equitable Lien.*

The final issue presented in the parties' summary judgment briefing is First Financial's threadbare, one-paragraph request for imposition of an equitable lien. The *West Beach* Action may have proceeded to judgment in the Northern District of Alabama, but it is not yet over. To the contrary, West Beach has appealed the judgment in that case to the Eleventh Circuit, where it is arguing, *inter alia*, that the district court erred in declining to vacate the foreclosure sale. In light of these circumstances, First Financial reasons that it "runs some risk of being divested of its redemption title" and requests entry of "an equitable lien in favor of First Financial upon all present, future or contingent interests of CS Assets in Parcels A through E, along with any associated indebtedness of West Beach." (Doc. 52, at 21.) CS Assets opposes the request for an equitable lien on the grounds that it is unfair and unnecessary, and instead proposes certain other arrangements that it contends are adequate to protect First Financial. (Doc. 59, at 30.)

---

piecemeal redemption, despite the disfavored status of same. Had CS Assets not made that election, First Financial would have been on the hook for the property taxes for Parcel F and the Metes and Bounds Parcel, either upfront or in the form of an add-on to the statutory redemption price. The Court will not penalize First Financial for attempting to play by the rules discouraging partial redemptions and for being unable to read CS Assets' mind as to its desire to split the transaction into a partial redemption, with all of the attendant complications and inconveniences.

Unfortunately, First Financial elected not to respond to CS Assets' arguments in opposition to the equitable lien request, so First Financial's position concerning CS Assets' arguments against imposition of an equitable lien here is simply unknown.

The more fundamental defect in First Financial's request is that it has failed to articulate an explanation for why any equitable lien, much less one as sweeping as that sought, is necessary to protect its interests.  Alabama courts have imposed equitable liens only in certain narrow circumstances, none of which appear to be present here.  *See Prince v. Crow*, 589 So.2d 161, 163 (Ala. 1991) (explaining that "imposition of an equitable lien has been limited to three situations in Alabama," to-wit: (a) an improver acting under mistaken belief of ownership makes improvements on the land of another because of fraud, duress, undue influence or mistake; (b) the true owner of land makes a demand for rents and profits, and the bona fide occupant under a claim of title receives a set-off for valuable improvements he made to the land; and (c) recovery for permanent improvements upon suggestion and proof of adverse possession, where true owner brings action to recover possession of land).[52]

Furthermore, it cannot come as a surprise to First Financial that it is in precisely the position it now faces (*i.e.*, one in which a redemption price is being fixed and the redemption transaction can be concluded, but the underlying issue of the validity of the foreclosure sale has not been fully and finally adjudicated on appeal).  First Financial recognized more than 11 months ago that "[i]f West Beach prevails in its case against CS Assets, both the foreclosure sale and the redemption by First Financial Bank will be undone."  (Doc. 10, ¶ 1.)  Yet rather than requesting a stay of these proceedings on that basis, First Financial expressed confidence that "if the foreclosure is set aside after the redemption proceeds have been paid over to CS Assets, First Financial Bank will be entitled to restitution."  (*Id.*, ¶ 3.)  In its summary judgment filings, First Financial offers no explanation whatsoever why the restitution rights it identified back in

---

[52]    *See also Hill v. Hill*, 757 So.2d 468, 472 (Ala.Civ.App. 2000) ("[A]n equitable lien arises when a person makes improvements on another's property as a result of fraud, duress, undue influence, or mistake."); *Jordan v. Mitchell*, 705 So.2d 453, 458 (Ala.Civ.App. 1997) (in describing the "equitable grounds essential to give the 'equitable lien' principle a field of operation ..., mere passive conduct on the part of the party against whose interest the lien is sought is not sufficient") (citation omitted).

January 2009 will be insufficient to safeguard it should the "risk of being divested of its redemption title" come to fruition in the ongoing appellate proceedings in the *West Beach Action*. The Court will not endeavor to fill in these legal and logical gaps for First Financial. Accordingly, the undeveloped afterthought request for equitable lien is **denied**.

**V.    Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.    The Motion for Summary Judgment of Defendant (doc. 46) and the Motion for Summary Judgment by Plaintiff (doc. 51) are both **granted in part**, and **denied in part**.

2.    The redemption price for Parcels A through E is fixed at **$2,733,069.91**.[53]

3.    Plaintiff's request for imposition of equitable lien is **denied**.

4.    Because the foregoing resolves all triable issues joined in this matter, the Final Pretrial Conference, and all associated trial and pretrial deadlines, are **canceled**.

In light of these rulings, however, several questions remain unanswered, including the following: (a) the form of judgment (if any) that should be entered at this time; (b) whether the funds on deposit in the Court Registry ($3,207,995.65, plus interest accrued since the February 27, 2009 deposit date) should be disbursed at this time, and if so in what amounts and to whom;[54]

---

[53]    That amount is calculated as follows: $1,600,000 (purchase price in foreclosure) plus $179,934.43 (interest on purchase price through commencement of redemption lawsuit) plus $781,298.04 (adjusted balance due on debt) plus $109,811.44 (interest on adjusted balance of debt through commencement of redemption lawsuit) plus $40,815.00 (*pro tanto* share of reasonable attorney's fees and expenses accrued in foreclosure and deficiency actions) plus $48,978.00 (*pro tanto* share of contractual late charge) minus $27,767.00 (offset for tax payments by plaintiff on non-redeemed parcels).

[54]    For any and all disbursements of the funds on deposit, the Clerk of Court will require payee names, addresses, and Social Security Numbers or Tax Identification Numbers, as appropriate. Also, the parties are reminded that, in accordance with the fee schedule promulgated under 28 U.S.C. § 1914, the Clerk of Court will withhold a fee of 10% of the total interest earned on these funds while they were on deposit in the Bank of America money market account in connection with this matter.

and (c) whether there is any reason why final judgment should not be entered at this time.[55] Counsel for both parties are **ordered** to meet and confer in good faith concerning all of these issues, and to submit a joint report (identifying any areas of disagreement that may exist, and delineating their respective positions as to those areas) on or before **January 27, 2010**.[56]

DONE and ORDERED this 13th day of January, 2010.

s/ WILLIAM H. STEELE

UNITED STATES DISTRICT JUDGE

---

[55]     Among other things, the Court recognizes that First Financial has suggested that if the redemption price is not to its liking, it may "seek to dismiss its claim for redemption." (Doc. 61, at 13.)  Alabama courts have recognized that a redemptioner does not have to comply with a judgment fixing the redemption price, but can instead forego making the payment and forfeit its redemption right.  *See Rhoden v. Miller*, 495 So.2d 54, 58 n.3 (Ala. 1986) (redemption judgment "merely allows the plaintiff to purchase the property from the defendant within a specified time at a fixed dollar amount," such that "[f]ailure to comply with the terms of the judgment results only in the plaintiff's losing his right of redemption").

[56]     To assuage any concerns relating to the requirement that the parties work together on this report, no party will be deemed to have waived any objections to this Order by participating in the above-described process.  Therefore, it is not necessary for the parties to lard the joint report with caveats that they reserve their right to seek other recourse from this Order. No waiver of such rights will be construed from their mere compliance with the reporting requirement.